Elizabeth BLODGETT and Richard
Tarmey, Plaintiffs,

v.

COUNTY OF SANTA CRUZ, Pat Liber-
ty, Dan Forbus, Chris Matthews, and
Gary Patton, Defendants.

No. C–80–1077 WHO.

United States District Court,
N.D. California.

Sept. 23, 1981.

Joseph M. Gughemetti, Morley & Gughemetti, Palo Alto, Cal., for plaintiffs.

Clair A. Carlson, County Counsel, James M. Ritchey, Asst. County Counsel, Santa Cruz, Cal., E. Clement Shute, Jr., Shute, Mihaly & Weinberger, San Francisco, Cal., for defendants.

## MEMORANDUM OPINION

ORRICK, District Judge.

Plaintiffs, Elizabeth Blodgett and Richard Tarmey, are owners of three adjoining properties located in the rural area of the County of Santa Cruz ("the County") consisting of approximately 71 acres. Defendants Liberty, Forbus, Matthews, and Patton were members of the Santa Cruz County Board of Supervisors ("the Board") in 1979 and 1980.[1] The complaint, filed under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, and 1986, charges that the Board engaged in a series of knowing and intentional acts which were designed to deprive plaintiffs of due process in public hearings, resulting in the arbitrary denial of plaintiffs' applications for minor land subdivisions. Defendants moved this Court for summary judgment, claiming that the County denied plaintiffs' applications in accordance with adopted planning policies and procedures and that defendants are entitled to immunity from suit because the acts alleged were performed in their legislative capacity. This Court determined that no genuine issues of material fact remained for trial, and partial summary judgment was accordingly granted. This Court granted the parties' joint request to submit additional briefing on the remaining issues. Plaintiffs additionally filed a motion for reconsideration, and subsequently filed one for leave to supplement their complaints. For the reasons set forth below, this Court reaffirms its order granting defendants' motion for summary judgment and denies plaintiffs' motions for reconsideration and for leave to supplement their complaint.

## I

California law requires that all cities and counties within the state must adopt a comprehensive, long-term general plan for their physical development containing certain specified elements, and that all land use decisions must be consistent with those general plans. Cal. Gov't Code §§ 65300, 65302, 65860 (Deering). The first general plan of the County was adopted in 1961. At that time the property involved in this dispute was designated as "conserved," entitling it to full protection from any use that would harm its natural character. Plaintiffs purchased the property as an 80-acre parcel in 1965. They divided and sold two parcels from this original parcel, and in December, 1971, divided the remaining property into 3 parcels. At that time County regulations did not require County approval for the division. On January 22, 1972, however, planning regulations requiring the approval of the County for the division of rural property went into effect.

In September, 1972, plaintiffs' properties were zoned UBS–20 (unclassified building site; area requirement 20 acres). This zoning designation requires a minimum of 20 acres for each building site or dwelling unit and has remained in effect for plaintiffs' properties since that date. In 1973 the County adopted a Parks, Recreation and Open Space Element ("PROSE") as part of its general plan. This element provided that water recharge areas should be protected and maintained in their current parcel size.

Plaintiff Tarmey filed an application in 1976 for the division of one of his properties into four parcels. The application was recommended for denial by a member of the County Planning staff because it conflicted with the 1961 general plan and with the 1973 PROSE of the general plan. The application was denied by the Planning Commission on February 16, 1977, and by the

---

1. Supervisor Marilyn Liddicoat did not vote against the application and has not been named as a defendant in this action.

Board on April 12, 1977. At that time, the property was designated as being within a moderate fire hazard area.

Section 65302 of the California Government Code requires that each county adopt a Fire Safety Element as part of its general plan. In accordance with this requirement the County Planning Commission adopted a fire safety element on September 28, 1977.[2] The element designated the subject properties as part of a critical fire hazard area. It was, therefore, subject to a minimum parcel size of 20 acres. This designation was placed upon the property after public hearings involving testimony from the fire marshal and other independent fire officials. Plaintiffs did not appear at these hearings to contest the designation. The Fire Safety Element was adopted by the Board of March 7, 1978.[3]

On June 6, 1978, a majority of voters in the County adopted an initiative known as Measure J which discouraged subdivisions in rural areas. Measure J required the Board to implement the provisions of the ordinance within six months of the date of adoption. In order to do this the Board on January 23, 1979, adopted the Measure J Rural Development Policies. This document was revised on November 13, 1979. The fire safety element was incorporated into this document along with a water resources protection matrix which required a minimum 10-acre parcel size for property located within a primary groundwater recharge area. Plaintiffs' properties were within such an area.

In 1979, it came to the County's attention that the General Plan might be inadequate under state law. Rather than run the risk that all of its development approvals could be challenged in court, the County sought an extension from the State Office of Planning and Research ("OPR"). The OPR granted the extension, though in doing so it imposed certain conditions, among which was a requirement that a minimum 10-acre parcel size shall be required within primary groundwater recharge areas. This extension agreement was entered into by resolutions adopted by the Board in open public meetings. In September, 1980, the County adopted a general plan. The new plan maintained the 10-acre minimum parcel size for land in primary water recharge areas.

The events leading up to the present lawsuit began in 1978 and 1979 when plaintiffs filed applications with the County for zoning changes and minor land divisions of their properties. In order to allow the subdivisions requested, a rezoning of plaintiffs' property would be necessary. Tarmey's application sought to divide his 15.4-acre parcel into 3 parcels of approximately 5 acres each and his 28-acre parcel into 4 parcels, three of which were less than 10 acres in size. Blodgett's application sought to divide her 25.1-acre parcel into 4 parcels. The average parcel size of the surrounding properties averaged 2½ acres. In late 1979 the staff of the County Planning Department recommended denial of the applications on the ground that the applications were not consistent with County planning policies.

In December, 1979, the Planning Commission referred the applications to the Board without a vote of recommendation. The Board directed the Planning Commission to make a recommendation and in January, 1980, the Commission by a vote of 3–2 recommended that the Board deny the applications. In late January the Board directed the Planning Director and County Administrative Officer to meet with plaintiffs' attorney and the OPR regarding the applications. OPR there stated that the applica-

---

**2.** The Planning Commission which adopted the Fire Safety Element was composed of Stanley O. Nielson, Chairperson, Robert Anderson, Penny Barkin, Mary Hammer, and Celia Von der Muhl Scott. Ms. Scott was the only member of the Planning Commission which adopted this element who also sat as a Planning Commissioner when plaintiffs' applications were considered. First Affidavit of Kris Schenk at 7, March 11, 1981.

**3.** Members of the Board at the time of adoption included Edward Borovatz, Chairman, Phil Baldwin, Marilyn Liddicoat, Gary Patton, and Cecil Smith. Only Ms. Liddicoat and Mr. Patton remained on the Board when plaintiffs' applications were considered.

tions could not be approved consistent with County planning policies and that approval would violate the terms of the extension agreement. After hearings had been held before the Planning Commission on December 12, 1979, and January 16, 1980, and the Board on January 29, 1980, and February 12, 1980, both applications were denied without prejudice.

Plaintiffs filed this suit claiming that defendants acted intentionally to deprive them of the use of their property, denied them due process in public hearings, and otherwise violated their constitutional and civil rights. Plaintiffs specifically allege that: the map designations relied on by the County in determining critical fire hazard and water recharge areas were false and arbitrary; the agreement between the County and OPR violates the constitutional guarantees of due process and a fair hearing; the denial constituted spot discriminatory zoning; the Board acted in knowing violation of County policies which allowed applicants to mitigate the fire hazard and water recharge problems that caused denial of the applications; defendants denied the applications with knowledge that plaintiffs had acquired a vested right to the development of the properties; and defendants conducted arbitrary public hearings in which plaintiffs' attorney was barred from objecting to false testimony offered by the County planning staff and at which plaintiffs' attorney was ejected when he objected to allegedly illegal attempts of the Board to continue the hearing without a vote. Plaintiffs additionally allege that defendant Supervisors Liberty, Forbus, Matthews, and Patton acted in bad faith with the specific intention of violating plaintiffs' constitutional and civil rights, and pursuant to a conspiracy with the staff of the Planning Department, OPR, and other groups to effect a cessation of all property rights in the rural areas of the County.

Plaintiffs allege that through these actions the defendants have violated their Fifth and Fourteenth Amendment rights, and the rights guaranteed by 42 U.S.C. §§ 1983, 1985, and 1986. Plaintiffs pray for $500,000 general damages, unspecified special damages, damages for mental anguish and depression, and exemplary damages in an amount to be determined by the jury.

## II

■ Summary judgment is appropriate where there is no genuine issue of any material fact, or where, when the evidence is viewed in the light most favorable to the adverse party, the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Caplan v. Roberts,* 506 F.2d 1039, 1042 (9th Cir.1974). It is not enough for the party opposing the motion to point to disputes of fact. Rather, a showing of a genuine issue for trial must be made. *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir.1972). The existence of a genuine issue of fact is predicated upon the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. *McGuire v. Columbia Broadcasting System, Inc.,* 399 F.2d 902, 905 (9th Cir.1968).

■ Genuine issues of fact must be established by sufficient evidence supporting the claimed factual dispute to require a judge or jury to resolve the parties' differing versions of the truth in favor of the nonmoving party at trial. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975). Genuine issues are not raised by mere conclusory allegations. *Marks v. United States,* 578 F.2d 261, 263 (9th Cir.1978). Nor are they raised by allegations in the complaint which are not supported by the record submitted, and which are controverted by affidavits in support of the motion for summary judgment. Fed.R.Civ.P. 56(e); *Jensen v. Voyles,* 393 F.2d 131, 133 (10th Cir.1968). Where the adverse party fails to point to specific facts which refute affidavits submitted by the movant, summary judgment should be granted. *Bennett v. Campbell,* 564 F.2d 329, 331 (9th Cir.1977).

Although courts are normally slow to grant motions for summary judgment in cases involving alleged violations of constitutional rights, *Felix v. Young,* 536 F.2d

1126, 1135 (6th Cir.1976), such a motion may be granted in such cases when it is clearly appropriate, *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1975); *Kipps v. Ewell,* 538 F.2d 564 (4th Cir.1976); *Beal v. Lindsay,* 468 F.2d 287 (2d Cir.1972), and where the record is adequate. *See* 6 Pt. 2 *Moore's Federal Practice* ¶ 56.17(10). The function of a motion for summary judgment is to avoid a useless trial. *Sims v. Mack Truck Corp.,* 488 F.Supp. 592, 597 (E.D.Pa.1980). Based on the extensive record filed in connection with this case, this Court finds that no triable issue of material fact remains for trial and, therefore, grants defendants' motion.

### III

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * * "

Defendants do not contest that the Board's actions were taken under color of state laws. They readily admit that all actions taken were performed under the authority of County ordinances, regulations, and state statutes.

It is well established that low density residential zoning is within the established purview of the police power. *Agins v. City of Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *aff'd* 447 U.S. 225, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). However, it is equally well established that rights exist in the use of property, *Penn Central*

*Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), and that due process principles entitle an individual to a fair hearing before he is deprived of his property interests. *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975 (1974) (*dicta*); *Rogin v. Bensalem Township,* 616 F.2d 680, 694 (3d Cir.1980). The question presented to this Court is whether defendants deprived plaintiffs of a fair hearing in connection with their applications.

### A

At an abstention hearing held before this Court on July 11, 1980, plaintiffs stated that in this action they were attacking the actions of the Board and *not* the legality of land use policies or regulations in existence in the County of Santa Cruz.[4] Counsel for plaintiffs specifically stated that they were not challenging the critical fire hazard and groundwater recharge designations used by the County. In an order issued on October 21, 1980, this Court declined to abstain, noting that this suit concerned a challenge to the *conduct* of the defendants rather than to the validity of County and state zoning regulations.[5] Finally, in a motion for reconsideration filed after this Court's ruling on April 10, 1981, granting partial summary judgment, plaintiffs represented that the validity of the local planning maps was not an issue before this Court.[6]

Plaintiffs' first allegation, however, charges that the Board denied the applications in bad faith and on the basis of the designation of the properties as critical fire hazard and groundwater recharge areas with the knowledge that these designations were false and based upon "arbitrary, vague, overbroad, discriminatory and erroneous map designations."[7] Aside from the

---

4. Court hearing on July 11, 1980.

5. Memorandum and Order, October 21, 1980.

6. Plaintiffs' memorandum of points and authorities in support of motion for reconsideration filed May 6, 1981, at 3.

7. Plaintiffs' first amended complaint for damages at 3.

fact that this allegation necessarily involves a challenge to the validity of the map designations and is, therefore, outside the scope of this lawsuit, plaintiffs have provided no facts from which this Court can determine the map designations are false as applied to their property. Instead, the evidence submitted by plaintiffs supports the designations.

### 1.

Plaintiffs' applications were denied in part because the property was located in an area which was designated as a critical fire hazard area on County planning maps. Measure J Rural Development Policies, in combination with the County Fire Safety Element and the 1961 General Plan, requires a minimum parcel size of 20 acres for parcels located in critical fire hazard maps. Plaintiffs have produced some evidence indicating that the maps may have been only 85 percent accurate and that the lines may have been arbitrarily drawn.[8] The record is devoid, however, of any evidence indicating that the map designations are false as applied to plaintiffs' property or that the property is not in a critical fire hazard area. Moreover, the record reveals that the designation of "critical fire hazard area" was placed upon the property after public hearings at which a "mountain of material" was considered and which included testimony from various individuals, including the fire marshal and other fire officials.[9] Factors used to establish the designation included vegetation type, fire district response time, and availability of water.[10] Plaintiffs did not appear at these hearings to contest the validity of the designations.

Evidence submitted to this Court by both parties supports the designations. The Geological Feasibility Investigation Report prepared by Jeremy Wire states that the site is covered by dense vegetation.[11] Fire protection is provided only by the state Division of Forestry.[12] The letter from Fire Prevention Supervisor Frank B. Lewis, on which the plaintiffs rely heavily for evidence that the property is not within a critical fire

---

In their motion for reconsideration plaintiffs have recharacterized the issue before the Court with regard to this allegation as whether or not the County and defendants continued to arbitrarily apply the map designations to the property after facts had been disclosed to the defendants that the property and applications did not pose fire hazard or water recharge problems.

In responding to this argument, this Court first notes that no evidence has been submitted revealing the disclosure of facts indicating that the property did not present a fire hazard or that it was not in a water recharge area. The affidavits containing the representations of Mel Angel, the County Fire Chief, and the letter submitted from Frank Lewis stated only that the proposed development *would* pose no fire problems *if certain steps were undertaken.* Similarly, the report by Geoconsultants Inc. states that groundwater recharge could be increased, not that they are not in such an area. Since plaintiff Tarmey now claims that he is not challenging the map designations and it can, therefore, be assumed that they are valid with regard to this property, the question of whether the County arbitrarily continued to apply them in the face of evidence indicating that the proposed developments would alleviate existing problems involves the question of whether County policies allowed for mitigation. If the policies did not, the County's continuing application of the designations cannot be said to be arbitrary. If, however, the policies did allow for mitigation, defendants' continuing application could be found to be arbitrary. This was precisely the issue which was originally left for further briefing. *See* section IIIG, *infra.*

**8.** See declaration of Joseph M. Gughemetti at 3, 5. This affidavit contains statements made to Mr. Gughemetti by Frank Lewis, a state forester; Mel Angel, the County Fire Chief; Eldon Sherwood, a County planner; and Supervisors Liberty and Forbus. It is difficult to determine whether Mr. Gughemetti is characterizing this testimony or reporting what they quoted to him. No affidavits have been produced from any of these individuals containing these statements.

**9.** Deposition of Marilyn Liddicoat, April 6, 1981, at 6; affidavit of Kris Schenk, March 11, 1981, at 7.

**10.** Schenk affidavit at 7–8. Santa Cruz Fire Safety Element at 13. Exhibit E to defendants' motion for summary judgment.

**11.** Geological Feasibility Investigation report prepared by Geoconsultants Inc. for Richard D. Tarmey and Elizabeth Blodgett at 7 (hereinafter cited as "Geological Report"). Attached to Exhibit G, plaintiffs' materials in opposition to motion for summary judgment.

**12.** Schenk affidavit at 2.

hazard area, does not support this position but instead states that the plan proposed by plaintiffs will meet fire protection needs if certain mitigating steps are undertaken.

"The areas of concern as listed to be within the County Critical Fire Area were discussed. The applicant is agreeable to modify the vegetation to reduce this area from a critical fire hazard area. The modification or reduction of the brush stands can be modified without undue disturbance to the surrounding land.

\* \* \* \* \* \*

The area of proposed development appears to pose no *additional* problem to fire protection. \* \* \*" Letter from Frank B. Lewis to Mark Eymard dated August 28, 1979 (emphasis added).

■ Based upon the record submitted, this Court cannot conclude that the designations are false as applied to the plaintiffs' properties. Plaintiffs have produced no evidence indicating that they are not in a critical fire hazard area. If the validity of legislative classifications for zoning purposes is even fairly debatable, the legislative judgment must be allowed to control. *Euclid v. Ambler Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The fact that the designations were adopted after open public meeting militates against a finding of arbitrariness. The evidence submitted by plaintiffs on this issue relates more properly to possible mitigation measures that could be taken so that the proposed development would not pose a fire hazard.

### 2.

Plaintiffs' applications were also denied because their properties were located within areas designated as primary groundwater recharge areas. The extension agreement with the OPR as incorporated into the Measure J Rural Development Policies required minimum 10-acre parcel sizes for property located within such areas.

The record reveals that plaintiffs' property is within the Aromas Sand Formation, which is considered to be a high water-bearing formation and a water recharge area.[13] The parcels were mapped as an area within a primary groundwater recharge area by the Board along with 40,000 acres of the County. This designation was adopted after a series of public hearings were held before the Planning Commission and the Board.[14] Plaintiffs again did not appear at any of the public hearings to challenge this designation of their property.

Plaintiffs have not submitted any information which indicates that the property is not in a primary groundwater recharge area. In a deposition taken on December 22, 1980, plaintiffs' counsel stated that he would stipulate that the property was in a groundwater recharge area.[15] The geological report prepared for plaintiffs by Jeremy Wire does not challenge the designation. Instead, it states that a groundwater recharge problem does not exist because *eventual* development with proper draining and septic tank systems could provide an eightfold increase in groundwater recapture.[16] Again, this information does not indicate that the designations were false but rather that the problem could be mitigated.

■ Summary judgment on this issue is appropriate for three reasons. First, plaintiffs have stated they are not challenging County regulations and, more specifically, the designations. Second, plaintiffs have submitted no evidence from which this Court can deduce that the map designations are false as applied to the plaintiffs' property; the evidence submitted goes toward the question of mitigation. Finally, the hearings held before the designations were put into effect militate against a finding of arbitrariness.

### B

An additional ground relied on by the Board in denying the applications was that

---

**13.** Id. at 11–12; Geological Report at 7.

**14.** Schenk affidavit at 13.

**15.** Deposition of Joseph M. Gughemetti, December 22, 1980, at 19.

**16.** Geological Report at 7–8.

the extension agreement entered into with the OPR did not allow parcel sizes of less than 10 acres for property located within primary groundwater recharge areas. Plaintiffs challenge this agreement on two grounds. They allege that it was entered into secretly and that it was unconstitutional because through it the Board relinquished its discretionary voting powers in public hearings. They, therefore, contend that the hearings violated their due process rights because they prevented a consideration of the evidence on its merits and rendered the issue of truth or falsity irrelevant.

■ The allegation that the agreement was entered into secretly is false. The record reveals that the extension agreement was adopted by resolution in publicly noticed open public meetings of the Board. Defendants point to eight separate meetings during which the record as to this agreement was formulated.[17]

■ Plaintiffs' additional allegation that the agreement was unconstitutional is equally invalid. The power to regulate land use is an attribute of the state police power. In exercising this power the state legislature enacted comprehensive planning and land use laws. Cal. Gov't Code § 65000 et seq. These laws required that each county adopt a complete and adequate general plan. Cal. Gov't Code §§ 65300, 65302. They further granted the OPR, the body responsible for assisting and monitoring local planning, the authority to grant time extensions to counties which are having

problems adopting such a plan. Cal. Gov't Code § 65302.6. The purpose of the extension is to permit counties without complete plans to continue to review and approve development proposals pending adoption of such a plan. Cal. Gov't Code § 65302.6(b). In the absence of an extension grant under this section a county could be enjoined from approving development applications. *Save El Toro Ass'n v. Days,* 74 Cal.App.3d 64, 141 Cal.Rptr. 282 (1977).[18]

In 1979 the County learned that its general plan might be inadequate.[19] In order to prevent litigation challenging its zoning approvals, the County sought an extension from OPR. The OPR granted the extension but imposed certain conditions on the County. Among the conditions was a requirement that the County relinquish its discretionary authority for the approval of minor land divisions which proposed parcels of less than 10 acres in primary groundwater recharge areas.[20]

Section 65302.6(e) of the California Government Code gives the director of OPR broad authority to impose such conditions when granting time extensions for the preparation and adoption of general plan elements:

"The director may impose any conditions on extensions of time granted which the director deems are necessary to ensure full compliance with the State Planning and Zoning Law. In establishing such conditions, the director may adopt or modify and adopt any of the policies and procedures proposed by the * * * county * * *."

---

17. Schenk affidavit at 14.

Even if the Board had not held any public hearings and plaintiffs had thus had no notice of the agreement, it is not clear that any due process violation could be found. In entering into the agreement, the Board was acting in a legislative capacity. The conditions imposed by the agreement applied to all property within the County and not just to the plaintiffs' land. The protections of procedural due process do not extend to legislative actions. *Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir.1980).

18. Although *Save El Toro Ass'n v. Days,* 74 Cal.App.3d 64, 141 Cal.Rptr. 282 (1977), involved a complaint brought by a private association, evidence in the record indicates the pos-

sibility that OPR would act with the state Attorney General's office to "shut down the County" and prevent the Board from approving land use applications unless they complied with state law regarding the formulation of proper general plans. *See, e.g.,* deposition of Dan Forbus, November 26, 1980, at 6; deposition of Gary Patton, November 24, 1980, at 53–54.

19. Deposition of Forbus at 6–16, 56–57; deposition of Patton at 15–28.

20. *See* letter from Deni Greene, Deputy Director of OPR to Michael Van de Veer, May 21, 1979. Exhibit I, plaintiffs' materials in opposition to motion for summary judgment.

State planning and zoning laws contemplate and mandate open space preservation and protection of groundwater recharge basins through low density residential zoning. *See* Cal. Gov't Code §§ 65302(e), 65560–68, 65910–12. The temporary conditions imposed by the OPR were in furtherance of these legislative directives.

The County is a political subdivision of the State of California and, as such, is subject to the general laws of the state. Cal. Const. Art. XI, §§ 1(a), 7; *Younger v. Board of Supervisors of San Diego County,* 93 Cal.App.3d 864, 869, 155 Cal.Rptr. 921 (1979). These laws require the adoption of an adequate general plan and, if an extension is sought due to a desire to retain the ability to approve applications pending such adoption, expressly authorize the OPR to impose conditions on the granting of extensions. These laws, therefore, expressly authorize the agreement entered into in this case.[21]

Finally, plaintiffs' allegation that the agreement with OPR prevented a consideration of the evidence on its merits and rendered the issue of truth or falsity irrelevant cannot withstand close scrutiny. Plaintiffs had the opportunity to produce evidence showing that the parcels were not within a critical fire hazard area or a groundwater recharge area as established by County criteria. If they had shown the designations were in fact incorrect and that: the property had available water, the calculated response time of the proper fire department was incorrect, the vegetation type listed on the map was incorrect, the property did not lie within the Aromas red sand formation, the amount of rainfall calculated by the County was incorrect, or that

the retention figures used by the County were inaccurate, the density requirements would not have been applicable and the applications could have been approved.[22] Plaintiffs failed to produce such evidence.

Summary judgment is, accordingly, entered in favor of the defendants on this issue. The affidavits submitted by defendants revealing that the agreement with OPR was discussed at open public meetings stand uncontroverted by any materials other than the initial pleadings. Furthermore, the California legislature, through its police power, has expressly authorized these types of agreements under land use laws.

C

As a third claim plaintiffs contend that the County denied the applications knowing that all of the surrounding properties with virtually identical physical characteristics had average parcel sizes of 2½ acres. Defendants, however, point out that most of the smaller parcels were created prior to 1972 when the first County land division requirements became effective and, in addition, that the subdivision applications were denied because of the recent adoption of Measure J which discouraged subdivisions in rural areas. The uncontroverted affidavit submitted by the Chairperson of the Board, Pat Liberty, states that the policies applied to plaintiffs' development applications were identical to those applied to all other requests for rural land divisions considered by the County in 1979 and 1980.[23] The supplemental affidavit of Kris Schenk, the County Planning Director, likewise uncontroverted, states that the minimum parcel sizes set forth by the Measure J Rural Development Policies had been interpreted

---

**21.** Plaintiffs' contention that the agreement was unconstitutional amounts to a challenge to the constitutionality of § 65302.6(e), as any condition imposed by OPR modifying a county policy which is agreed to by the county would necessarily require relinquishment of some discretion. Plaintiffs have not challenged the constitutionality of this statute. Nor should this Court attack it on the basis of the record before it. *Elkins v. Moreno,* 435 U.S. 647, 660–61, 98 S.Ct. 1338, 1346, 55 L.Ed.2d 614 (1978); *Harrison v. NAACP,* 360 U.S. 167, 176–77, 79 S.Ct.

1025, 1029–30, 3 L.Ed.2d 1152 (1959) (federal courts should be slow to adjudicate the constitutionality of state enactments when unnecessary, particularly when they are open to interpretation and state courts have not been afforded the opportunity to pass upon them).

**22.** Affidavit of Pat Liberty, March 11, 1981 at 9–10.

**23.** *Id.* at 8.

consistently in the same manner as they were interpreted in this case during 1978, 1979, and 1980 in over 50 rezonings and minor land division applications.[24]

■ It is clear that, on the basis of the map designations, the agreement with the OPR and Measure J, the County had a rational basis for denying the applications of the plaintiffs. Legislation which bears a rational relationship to a permissible state objective will be upheld even if it discriminates to some extent. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). Discriminatory spot zoning will be found only where the denial is arbitrary and unreasonable. *Penn Central Transportation Co. v. New York City, supra,* 438 U.S. at 132, 98 S.Ct. at 2663; *see also Friedman v. Fairfax,* 81 Cal. App.3d 667, 146 Cal.Rptr. 687 (1978).

Plaintiffs have failed to controvert the affidavits and statements of defendants. In their motion for reconsideration they relied on defendants' assertion that the applications were denied in part because of the 1961 general plan.[25] If this had been the sole grounds for denial, a factual issue with regard to the discriminatory spot zoning would exist. The rationale relied on for denial, however, was the more recent enactments. Because plaintiffs have failed to controvert the affidavits offered by defendants which demonstrate that the County did not arbitrarily discriminate but rather applied the recent enactments evenhandedly, summary judgment is appropriate.[26] The fact that this claim involves the constitutional issue of discrimination does not preclude summary judgment. *Beal v. Lindsay, supra; see also Rogin v. Bensalem Township, supra* (counterclaim dismissed).

**D**

■ Plaintiffs also alleged that the Board denied the applications with knowledge that plaintiffs had acquired a vested right to the development of the properties through substantial expenditures for a public access road. Summary judgment is granted on this issue for two reasons. First, the County is not denying plaintiffs the right to develop the property. They are denying the request to develop it at a higher density than County policies allow. Second, the fact that plaintiffs have made substantial expenditures does not entitle them to a vested right to develop the property in the absence of a final approval of the rezoning applications. *AVCO Community Developers v. Coastal Commission,* 17 Cal.3d 785, 795, 132 Cal.Rptr. 386, 553 P.2d 546 (1976); *Call v. Feher,* 93 Cal.App.3d 434, 443, 155 Cal.Rptr. 387 (1979).[27]

**E**

Plaintiffs also contend that they were denied due process at the hearings on the applications. In support of this claim they allege that their attorney was evicted from the public hearing on February 12, 1980, because he objected to the Board's illegal attempts to continue the meeting without a vote. Plaintiffs also allege that the Board allowed false testimony to be presented at the hearing.

The concept of due process is not an inflexible one. *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1977); *Cafeteria Workers v. McElroy,* 367

**24.** Second Affidavit of Kris Schenk, May 6, 1981, at 5–6.

**25.** Plaintiffs' memorandum of points and authorities in support of motion for reconsideration, May 6, 1978, at 7–8.

**26.** In order to show discrimination and thus a denial of equal protection rights, plaintiffs would have to show that other applications were approved at parcel sizes beneath the minimum allowed by the Measure J Rural Development Policies during the period that their appli-

cations were denied. Plaintiffs have produced no evidence of this.

Because this Court finds no evidence of discriminatory conduct on the part of defendants in denying the applications and thus no denial of equal protection, the §§ 1985 and 1986 claims must necessarily fail. *See, e.g., Rogin v. Bensalem Township, supra* n. 17, 616 F.2d at 696.

**27.** Plaintiffs have dropped this allegation in their motion for reconsideration.

U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "Due process, unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951). Instead, it is a flexible concept which calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1015 (7th Cir.1980). The touchstone of due process is fundamental fairness. *Gagnon v. Scarpelli,* 411 U.S. 778, 790, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656 (1973). All that is necessary is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard to insure that they are given a meaningful opportunity to present their case. *Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). Even in the criminal arena where matters of life, liberty, and human dignity are at stake due process does not require perfection. *See, e.g., United States v. Walls,* 577 F.2d 690 (9th Cir.1978) (doctrine of harmless error).[28]

1.

■ A review of the transcripts submitted by each of the parties reveals that

plaintiffs' counsel, Joseph Gughemetti, was not evicted from the February 12 hearing. Summary judgment should be granted on an issue where the record shows the full truth of the matter in controversy. *Jones v. Musicians Union of San Francisco, Local No. 6,* 446 F.Supp. 391 (N.D.Cal.1977). The transcripts and affidavits submitted indicate that bad feelings were developing between the Board and Mr. Gughemetti at the hearing. Mr. Gughemetti was threatening court action against the County and, at one point, referred to one supervisor as a "mental midget."[29] A few minutes later the events constituting the alleged eviction occurred:[30]

> "PATTON: If no action is taken on this today Mr. Carlson, and we simply postpone it to June, does it meet the section 888 or whatever that is?
>
> GUGHEMETTI: The applicants wouldn't agree to that.
>
> LIBERTY: If you don't mind, I will run this meeting. I will eject you also.
>
> GUGHEMETTI: That would make the record complete.
>
> LIBERTY: Why don't you just excuse yourself?
>
> GUGHEMETTI: Order the administrative record and indicate that the Chairman of the Board has turned out the applicant.

**28.** Plaintiffs argue that due process requires that seven elements be present in any hearing and that violation of any one of these principles results in a violation of plaintiffs' Fifth and Fourteenth Amendment rights and the Civil Rights Act. These principles include: (1) an unbiased tribunal; (2) notice of proposed action and ground asserted for it; (3) an opportunity to present reasons why the proposed action should not be taken; (4) the right to call witnesses; (5) the right to have a decision based only on the evidence presented; (6) the right to counsel; and (7) a statement of reasons.

It is not clear that any or all of these safeguards are automatically required. *See Rogin v. Bensalem Township, supra* n. 17, 616 F.2d at 694. This Court does not reach the question of which are necessary for it does not find that the principles are violated. (1) The Board was biased only to the extent that the applications were required to comply with current County

planning policies, including the OPR agreement; (2) actions taken by the Board were taken at properly noticed hearings; (3) plaintiffs were given every opportunity to present their position; (4) the record does not show that plaintiffs were denied the right to call witnesses; (5) the decision was based on the evidence presented and County planning policies; (6) plaintiffs had counsel; and (7) reasons were given for the denial.

**29.** Liberty affidavit at 3.

**30.** Excerpts from the transcript of the Board's hearing on February 12, 1980, at 17, plaintiffs' Exhibit E to materials in opposition to motion for summary judgment. The transcripts submitted by the parties differ somewhat. Because this motion requires this Court to construe all material inferences in favor of plaintiffs, the transcripts submitted by plaintiffs have been used.

PATTON: I really object to that. Mr. Gughemetti is leaving us of his own free will. Mr. Gughemetti is in the room and until there are three votes in the room to eject somebody, they are not ejected.

GUGHEMETTI: Are you voting to eject me?

PATTON: No.

LIBERTY: Mr. Carlson, could you respond to the question in regard to the time frame?

PATTON: You interrupted the...

CARLSON: That would be too long. He'd have to waive his rights.

LIBERTY: Do you wish to waive your time?

GUGHEMETTI: We don't agree to anything except a decision tonight."

The record reveals that Mr. Gughemetti did not leave immediately after Supervisor Liberty asked if he would excuse himself, that he received a negative answer when he *asked* if he had been ejected, and that he continued to take part in the hearing. Although it appears that he left for a short period of time, he returned to the hearing and was not challenged.

Even had Mr. Gughemetti been evicted this Court could not find that the eviction violated plaintiffs' due process rights. At the point the altercation occurred the hearings were closed. Mr. Gughemetti had been abusive during the hearing. At one point he had been reprimanded by Supervisor Liberty and a motion had been made to adjourn because of his conduct. When the purported ejection took place, he was interrupting the proceedings. Finally, by his own admission, he was only gone from the meeting for a "couple minutes."[31]

**2.**

Plaintiffs' further allegations that they were deprived of due process at the hearings on the applications are not only unsupported by the record but are in direct contradiction to it. Affidavits and exhibits submitted by both parties demonstrate that plaintiffs received a full opportunity to present their position.[32] At the meeting held on January 29, 1980, applicants were given ample time and opportunity to present their applications. Plaintiffs do not contest this. At the February 12 meeting, after the close of the hearings, Mr. Gughemetti was given additional time to submit evidence supporting plaintiffs' case. Applicants were also given the opportunity to present written materials to the Board.

Plaintiffs rely on the fact that a 20-year-old map had been used at the hearing before the Planning Commission which indicated that large parcels surrounded the subject properties. The record of the Planning Commission was then introduced into the record of the hearing before the Board. The materials presented, however, reveal that Board members were fully apprised of the fact that surrounding parcels were of smaller average size. Mr. Gughemetti presented evidence of this both in writing and orally before the Board.[33] Thus, even were this Court to conclude that the 20-year-old map was improperly introduced into the record of the Board meetings, it could not find that this introduction resulted in a denial of plaintiffs' due process rights at the hearings.

Finally, this Court does not find that the agreement with the OPR deprived plaintiffs of a meaningful hearing in violation of their due process rights. Plaintiffs had the opportunity to show that the map designations were incorrect as applied to their

**31.** Deposition of Gughemetti at 57–58:
"Q. Were you present when the Board took final action on this application?
A. Yes.
Q. How about your clients; were they also present?
A. Yes.
Q. How long was the period of time between when you exited the room and—
A. Couple minutes.
Q. —and when you returned?
A. Couple minutes."

**32.** Gughemetti declaration at 5–6; *see also* affidavit of Liberty at 6; affidavits of Gary Patton, Chris Mathews, and Dan Forbus, filed March 11, 1981, at 2 of each.

**33.** Gughemetti declaration at 5–6.

properties. The agreement was legally entered into and was valid under state law.

In summary, the record simply does not support plaintiffs' allegations that they were denied due process at the public hearings. Even if this Court could conclude that plaintiffs' attorney was ejected for a couple of minutes and that the Board improperly allowed introduction of the Planning Commission record containing the 20-year-old map into the record of the Board hearings, this would not justify a finding that the hearings were fundamentally unfair. The materials presented to this Court conclusively reveal that the plaintiffs were given a full opportunity to present their position before the Board. Plaintiffs have not denied this fact. Summary judgment is granted on this issue.

## F

■ Plaintiffs further allege that the defendants acted pursuant to a plan or conspiracy with the staff of the County Planning Department, OPR, and private environmental groups to effect the cessation of all property rights in the rural areas of the County. The record is barren of any evidence indicating that such a conspiracy existed. Defendants have submitted evidence disproving the existence of any such plan. Affidavits reveal the Fire Safety Element was adopted in 1978 by a Board of Supervisors which included only one of the named defendants; that Mark Eymard, a senior planner with the County Planning Department, recommended denial of the applications on the ground that they were inconsistent with County planning policies; that the Planning Commission recommended denial on January 16, 1980, without contacting any member of the planning staff regarding the applications; and that the Board denied plaintiffs' applications without contacting any member of the planning staff regarding them.[34] The record also indicates that at a meeting with the OPR members of the County Planning Department supported approval of the applications,[35] that various Supervisors supported the applications at various times,[36] and that denials were based on County planning policies.[37] This evidence contradicts the conspiracy allegations. Because plaintiffs have submitted no evidence in support of their pleadings on this issue, summary judgment is appropriate.

## G

■ As a seventh ground, plaintiffs claim that the Board denied the applications in knowing violation of the Measure J Rural Development Policies ("the Policies") and the Board's own prior adopted policy allowing mitigation of the fire hazard and water recharge designations in order to escape the density constraints imposed by those designations. Defendants claim that the County's policies did not allow for mitigation of these designations. Summary judgment is granted on this issue.

There is language throughout the Policies which prohibits mitigation to reduce parcel sizes. With respect to groundwater recharge areas the Policies state:

"The following policies are minimum requirements: (a) Within water supply watershed and primary recharge areas a ten-acre minimum parcel size shall be maintained." Measure J Rural Development Policies at 26a.

With respect to Critical Fire Hazard Areas the Policies indicate that property located in critical fire hazard areas with a frontage road could be considered for division *only* for the lowest density allowed by the fire safety element, in this case 20 acres.[38]

---

**34.** Schenk affidavit at 4–6; *see also* Liberty affidavit at 6.

**35.** Gughemetti declaration at 3.

**36.** *See generally* affidavits of Richard Tarmey, March 31, 1981, at 4, Elizabeth Blodgett, March 31, 1981, at 3; affidavit of Patti Bonar, March 31, 1981, at 2; Gughemetti declaration at 3–4, 4(¶ 5); deposition of Gary Patton at 46.

**37.** Liberty affidavit at 6–7; Schenk affidavit at 5, 6, 5–14.

**38.** The Policies declare that divisions could be considered only at the lowest density allowed by the land use element of the general plan.

These sections show that the Policies did not allow for mitigation. However, the Policies also provided:

"It is expected that property owners will frequently have or be able to obtain more accurate information about their parcels than that possessed by the Community Resources Agency. By providing evidence that a suspected or potential limitation does not actually exist on their property, *or that an existing condition can be mitigated or reduced, owners will be able to increase their density criteria.*" Measure J Rural Development Policies at 15 (emphasis added).[39]

The Board could not have allowed for mitigation because of the extension agreement entered into with the OPR. In a letter to the County on May 21, 1979, the OPR set forth the conditions which were applicable to the agreement.[40] The letter stated that no land use approvals could be given for development at a greater density than that prescribed by the applicable area general plan. The letter further required the County to revise its then current policies to set a minimum 10-acre parcel size for property located within primary groundwater recharge areas.

"The matrix must explicitly state that the *minimum* size for new development within the area designated 'water supply' in the PROS Plan is 10 acres, regardless of the outcome of using the matrix. To this end, Water Resources Policy # 4 should be rewritten as follows: 'For all new development, a minimum 10-acre parcel size shall be required within Water Supply Watersheds (PROS Plan) and Primary Groundwater Recharge Areas.' * * *" Letter from Deni Greene, Deputy Director of OPR, to Michael Van De Veer, Director of Community Resources Agency, May 21, 1979.

In accordance with this request the County revised the Policies on May 25, 1979 (adopted May 29, 1979). In a second letter dated June 7, 1979, the OPR stated that it was satisfied that the County had complied with its earlier requests and reiterated the fact that land use applications had to be processed and approved in accordance with the standards and procedures in the Policies, including the minimum 10-acre requirement for parcels located in primary groundwater recharge areas.[41]

On February 11, 1980, the aforementioned meeting between representatives of the County, members of the OPR, and plaintiffs' counsel took place. At that time, Deni Greene explained that the County could not approve plaintiffs' applications and remain in compliance with the agreement. This is evidenced by a confirming letter sent to Kris Schenk, the new director of the Community Resources Agency, on February 15, 1980, three days after the

---

This was 20 acres. *See* Revised Measure J Rural Development Policies at 25, 26.

**39.** Plaintiffs also cite to the introduction of the Measure J Rural Development Policies as evidence that County policies allowed for mitigation. The introduction provides in pertinent part:

"The following policies are intended to consolidate into one reference the proposed guidelines for new development in rural areas. These standards, and the detailed resource and hazard maps that go along with them, would be used by applicants to 'red flag' the aspects of a site or of a project's design that could place it in conflict with County policy. Forewarned that the property was located in a general area of seismic activity or of water quality problems, for example, the developer would have the option of providing site specific information to demonstrate that the property was in fact free from the suspected problems. * * *"

Read literally, this paragraph gives the developer the opportunity to demonstrate that the property was in fact *free* from problems of critical fire hazard or groundwater recharge (*i.e.,* that the designations were incorrect) and not that a proposed development could alleviate such problems. It could, perhaps, also be read to indicate that, if it was shown that *problems* did not exist, the property could be developed.

The problem of which construction to give this paragraph is not before the Court since County policies, which included the extension agreement, did not provide for mitigation.

**40.** *See* letter from Deni Greene to Michael Van de Veer, *supra* n. 20.

**41.** *See* letter from Deni Greene to Michael Van de Veer, June 7, 1979.

Board had voted to deny the applications without prejudice.

"This letter confirms my position on the Blodgett and Tarmey rezonings and minor land divisions. As I explained at our meeting of February 11, with you, Michael Van de Veer, and Joseph Gughemetti, it is my judgment that the County could not approve the rezonings and minor land divisions at this time consistent with the Measure J Rural Development Matrix.

Because the purpose of the extension is to preserve the County's planning options while granting it immunity from suits over the adequacy of its general plan, piecemeal changes to the conditions undermine the Legislature's purpose in allowing an extension. As I've said before, OPR should not be in the position of having to make case-by-case judgments, these are decisions that should be made by locally elected officials as you revise your comprehensive general plan. *The request affecting the Blodgett and Tarmey parcels would have the effect of changing the conditions to which we mutually agreed last June.*" Letter from Deni Greene to Kris Schenk, February 15, 1980 (emphasis added).

It is clear from this record that the County could not allow mitigation without violating the extension agreement entered into with OPR. County policies, which included the extension agreement, clearly did not allow for mitigation at that time. Summary judgment on this issue is granted.

## IV

Defendants argue that they are entitled to absolute legislative immunity. In *Thomas v. Younglove,* 545 F.2d 1171 (9th Cir. 1976), the Ninth Circuit ruled that the applicability of legislative immunity to county supervisors in a § 1983 civil rights action must be determined through the application of the principles enunciated by the Supreme Court in *Scheuer v. Rhodes,* 416 U.S. 232, 94

S.Ct. 1683, 40 L.Ed.2d 90 (1974), and *Wood v. Strickland* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

In *Scheuer,* the Court held that in deciding whether immunity is available as a defense an analysis is required of "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes, supra,* 416 U.S. at 247, 94 S.Ct. at 1691.

The *Wood* decision applied a good-faith test to the official actions. In *Wood,* the Supreme Court held that a school board member has no immunity under § 1983:

"if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1000.

Defendant argues that, in light of the Supreme Court's decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the *Thomas* case is no longer good law. In *Lake Country Estates,* the Court held that the legislators are entitled to absolute immunity. However, it explicitly left open the question of whether individuals performing legislative functions at the local level should be afforded such immunity.[42] The Ninth Circuit has recently stated its accordance with this position. *See Flores v. Pierce,* 617 F.2d 1386 (9th Cir.1980), *citing Morrison v. Jones,* 607 F.2d 1269, 1274 (9th Cir.1979), (*per curiam*) *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980).

Under the doctrine of qualified immunity as enunciated in *Scheuer* and *Woods,* the Supervisors are not entitled to

---

**42.** *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 404 n. 26, 99 S.Ct. 1171, 1178 n. 26, 59 L.Ed.2d 401 (1979).

immunity from suit if their actions were taken in bad faith with the intention of depriving plaintiffs of their constitutional rights. The plaintiffs, however, have shown no action on the part of defendants which deprived plaintiffs of their constitutional rights. This Court is concerned about the fact that the plaintiffs made substantial expenditures based on the alleged erroneous statements of three of the Supervisors to the effect that the applications would receive Board approval if plaintiffs could prove that the proposed development would not cause groundwater recharge problems. However, these possible misrepresentations do not rise to the level of a violation of plaintiffs' constitutional rights. Because plaintiffs have shown no conduct on the part of the defendants which has deprived them of constitutionally protected rights the question of immunity, with respect to the action before this Court, has become mooted.

## V

Plaintiffs have failed to go beyond the allegations of the complaint and submit any evidence from which the trier of fact could make a determination that defendants deprived them of their constitutional or civil rights or that the proceedings before the Board were in any way constitutionally deficient. The record conclusively shows that: the applications were denied on the basis of County regulations (map designations) which covered the plaintiffs' property and which were validly enacted after open public meetings which the plaintiffs failed to attend; that the agreement between OPR and the County was authorized by California state law under the exercise of its police power to regulate land use; the Policies, since their enactment, had been consistently applied to all applicants for land divisions; County policies (which included the agreement with OPR) did not allow for mitigation; the plaintiffs had no vested right to development of the property; and the plaintiffs were given a full and meaningful opportunity to present their reasons, both through written materials and by oral presentation, as to why the applica-

tion of County land use regulations should not have required denial of the applications. Further, the plaintiffs have produced no evidence in support of their allegation that the defendants acted pursuant to a conspiracy to deprive the plaintiffs of their constitutional rights.

This Court finds no genuine issue of material fact remaining for submission to the trier of fact. Plaintiffs' motion for reconsideration is, accordingly, denied, and defendants' motion for summary judgment is granted.

## VI

With regard to the plaintiffs' motion for leave to amend their complaint, "[p]laintiff's understandable desire to avoid the effects of the defendant's motion for summary judgment is insufficient reason for infusing new life into a case where the plaintiff has been unable * * * to establish any genuine issues of fact." *Glesenkamp v. Nationwide Mutual Insurance Co.,* 71 F.R.D. 1, 4 (N.D.Cal.1974), aff'd per curiam, 540 F.2d 458 (9th Cir.1976). It is within the discretion of the Court to deny such a motion where there has been sufficient opportunity to state a claim and there has been a failure to do so, or where the motion is unduly delayed. 3 *Moore's Federal Practice* ¶ 15.08[4] (2d ed. 1980).

The first paragraph of the plaintiffs' supplement is essentially the same claim of "discriminatory spot zoning" which this Court has already dismissed on summary judgment. Further, the defendants, in response to plaintiffs' conclusory allegation, have submitted an affidavit from a planner in the County's Land Planning Department showing the differences between the land just recently granted a variance and the plaintiffs' land. The issue should not be reopened.

The plaintiffs' other supplementary claims alleging trespass and tortious interference with contractual relations, accepting that the acts occurred in "early 1981," could have been brought to the Court's attention at the hearing on the motion for

reconsideration on May 22, 1981, and only serve now to needlessly delay resolution of this litigation. They are at best related to the claims which are before the Court in an attenuated manner. Finally, these are more properly state claims, which may yet be addressed in that forum, rather than federal claims under the Civil Rights Acts or the Constitution. Therefore, this Court denies the motion.