Opinion
 

 CALDECOTT, P. J.
 

 Plaintiffs-appellants Save El Toro Association, et al.
 
 [1]
 
 (hereinafter Save El Toro) filed a complaint in the Superior Court of Santa Clara County against defiendants-respondents,
 
 [2]
 
 seeking a temporary restraining order and a preliminaiy injunction restraining construction of the district improvements, sale of the subdivided lots, and an order annulling approval of the maps and adoption of the resolutions creating the district. Save El Toro alleged that approval of the subdivision maps, award of the construction contract, and creation of the assessment district contract was unlawful in that any action by a city which restricts the use of open space land must be consistent with the
 
 *67
 
 city’s local open space plan and as the City of Morgan Hill has not adopted a legally sufficient open space plan, as mandated by Government Code section 65560 et seq., it is barred from taking such action.
 

 A review of the applicable resolutions passed by the city shows that in November 1969, a general plan was adopted that contained a park and open space element. A housing element was added to this plan in March 1972. On April 4, 1973, the general plan was amended when the city’s open space plan was adopted. In October of the same year, the city council adopted its El Toro Policy which provided that all lands above 800 feet elevation would remain in permanent open space.
 

 On May 19, 1976, the Morgan Hill City Council, by a 3-2 vote, approved the final subdivision maps here in question creating a total of 30 residential lots on 52 acres of land on the face of El Toro Peak
 
 [3]
 
 at and below the 800-foot elevation line. The tentative map had been approved by the planning commission on December 16, 1975.
 

 On September 29, 1976, the council, by a 3-2 vote, formed the assessment district
 
 [4]
 
 and awarded the contract for construction of improvements to respondent Eilert & Smith. That same day, Save El Toro
 
 [5]
 
 filed its action for a temporary restraining order, preliminary and permanent injunction restraining construction of the district improvement, sale of the subdivided lots depicted on the final map and adoption of the resolutions creating the district. The temporary restraining order was issued: At a subsequent hearing, the court denied appellants’ request for a preliminary injunction and dissolved the temporary restraining order. The appeal is from that order.
 

 I
 

 On December 16, 1975, the planning commission approved the tentative map for the subdivision. The city council approved the final
 
 *68
 
 map on May 19, 1976. Save El Toro Association filed this action on September 29, 1976.
 

 Respondents assert that since Save El Toro did not file its action within 180 days after the planning commission approved the tentative map, the association is barred from bringing its action under Government Code section 66499.37.
 
 [6]
 
 That section provides: “Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 180 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations. Any such proceeding shall take precedence over all matters of the calendar of the court except criminal, probate, eminent domain and forcible entry and unlawful detainer proceedings.”
 

 The right to maintain an action under this section depends upon whether a party brings the action within 180 days after
 
 “the decision
 
 of an advisory agency, appeal board or legislative body concerning a subdivision.” This statute of limitation provision clearly does not distinguish between a decision approving a tentative map and one approving a final map.
 

 Respondents rely on
 
 Great Western Sav. & Loan Assn.
 
 v.
 
 City of Los Angeles
 
 (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359], for the proposition that approval of a final map is not a decision but only a ministerial act. Thus, as the association did not file its action within 180 days after the decision to approve the tentative map, it is barred from bringing this suit. In
 
 Great Western,
 

 [7]
 

 the City of Los Angeles and its city council, et al., appealed from a judgment that granted a developer a peremptory writ of mandate ordering acceptance, approval and recordation of a final map. In September 1969, the city council adopted the decision of the city
 
 *69
 
 planning commission approving the tentative map. The council’s approval was contingent, however, upon several conditions. On March 15, 1971, the developer filed a final map. The city engineer approved the map, noting that all the conditions imposed at the tentative map stage had been satisfied. The engineer then submitted the final map to the city council. On March 24, the city council disapproved the final map. The developer responded by filing a petition for a writ of mandate alleging that the city council possessed no discretionary right to disapprove the final map. On appeal, the court held that acceptance by the city council of a final map that complies with
 
 applicable state and local law
 
 and the tentative map is administrative and ministerial.
 
 (Supra,
 
 at pp. 414-415.) Thus, as the developer had complied with the conditions imposed by the city council, he was entitled to approval of the final map.
 

 We find that
 
 Great Western
 
 is distinguishable from the case at hand for several reasons. First of all, there are significant differences between the local law of the City of Los Angeles and that of Morgan Hill. The Municipal Code of the City of Morgan Hill provides for a two-step approval process for subdivisions. First, tentative maps are submitted to the planning commission which decides whether the map is in conformity with the provisions of the law. The commission has 30 days in which to approve, disapprove or conditionally approve the map. The subdivider then has 18 months after the commission’s decision to prepare a final map in conformance with the tentative map. The city engineer examines the map to determine whether it is substantially the same as the tentative map and whether the conditions imposed have been met. If the engineer determines that the map is in full conformity it is transmitted to the planning commission. The planning commission then determines whether the map conforms with the tentative map and if all the conditions have been met. The map then is sent to the city council. If the city council shall determine that the map is in conformity with the requirements of the chapter,
 
 that it is satisfied with the plan of subdivision,
 
 and shall accept all offers of dedication, it shall approve the map. If the city council determines either that the map is not in conformity with the requirement of this chapter or
 
 that it is not satisfied with the plan of subdivision, it shall disapprove the map.
 
 The subdivider shall have 30 days in which to file with the planning commission, a map altered to meet the approval of the city council.
 
 No map shall have any force or effect until it has been approved by the city council.
 
 This procedural framework differs from the City of Los Angeles most significantly in that the code of Los Angeles
 
 requires
 
 that the city council accept the final map if it conforms
 
 *70
 
 to the tentative map, whereas, the City Council of Morgan Hill need not approve the map unless it is satisfied with the plan of subdivision.
 

 Lastly, the Court of Appeal in
 
 Great Western
 
 specifically states that there may be instances when the city council may act other than to approve a final map. (P. 413.) One such instance, of course, would be if the final map violated the state law as asserted by Save El Toro.
 

 Under the facts of this case, we conclude that the approval of the final map by the City Council of Morgan Hill was a
 
 decision
 
 for purposes of section 66499.37. Thus, Save El Toro is not barred from bringing this suit as it filed the suit within 180 days after the approval of the final map by the city council.
 

 II
 

 Respondents also claim that Save El Toro provided the trial court with an inadequate record of the administrative proceedings so that it is barfed from maintaining this action. In particular, respondents maintain that Save El Toro provided inadequate records of the planning commission and city council proceedings.
 

 The record in this case consists of.the official minutes of the planning commission and city council regarding the West Dunne Avenue Assessment District and the approval of the subdivision maps. These , exhibits were introduced into evidence by stipulation of the parties. We have reviewed both of these exhibits and conclude that they adequately apprised the court of the administrative proceedings.
 
 [8]
 

 III
 

 The basic issue presented by this appeal is whether the City of Morgan Hill, by approving the subdivision map in question, violated section 65567. This section provides: “No building permit may be issued, no subdivision map approved, and no open-space zoning ordinance adopted, unless the proposed construction, subdivision or ordinance is consistent with the local open-space plan.” Obviously, for a subdivision
 
 *71
 
 map to be consistent with the open space plan there must first be such a plan.
 

 Appellants contend that the City of Morgan Hill has not adopted an open space plan as required by the Open Space Lands Act (§§ 65560-65570).
 

 At the outset the two-fold intent of the Legislature in adopting the act should be noted: “It is the intent of the Legislature in enacting this article: [¶] (a) To assure that cities and counties recognize that open-space land is a limited and valuable resource which must be conserved wherever possible. [¶] (b) To assure that every city and county will prepare and carry out open-space plans which, along with state and regional open-space plans, will accomplish the objectives of a comprehensive open-space program.” (§ 65562.) The act is also prefaced by the following legislative finding and declaration: “§ 65561. The Legislature finds and declares as follows: [¶] (a) That the preservation of open-space land, as defined in this article, is necessary not only for the maintenance of the economy of the state, but also for the assurance of the continued availability of land for the production of food and fiber, for the enjoyment of scenic beauty, for recreation and for the use of natural resources. [¶] (b) That discouraging premature and unnecessary conversion of open-space land to urban uses is a matter of public interest and will be of benefit to urban dwellers because it will discourage noncontiguous development patterns which unnecessarily increase the costs of community services to community residents. [¶] (c) That the anticipated increase in the population of the state demands that cities, counties, and the state at the earliest possible date make definite plans for the preservation of valuable open-space land and take positive action to carry out such plans by the adoption and strict administration of laws, ordinances, rules and regulations as authorized by this chapter or by other appropriate methods. [¶] (d) That in order to assure that the interests of all its people are met in the orderly growth and development of the state and the preservation and conservation of its resources, it is necessary to provide for the development by the state, regional agencies, counties and cities, including charter cities, of statewide coordinated plans for the conservation and preservation of open-space lands. [¶] (e) That for these reasons this article is necessary for the promotion of the general welfare and for the protection of the public interest in open-space land.” To effectuate this intent and policy, the Legislature requires that each city and county adopt a local open space plan. Section 65563 details the specific requirements of such plans. “On or before
 
 *72
 
 December 31, 1973, every city and county shall prepare, adopt and submit to the Secretary of the Resources Agency a local open-space plan for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction. Every city and county shall by August 31, 1972, prepare, adopt and submit to the Secretary of the Resources Agency, an interim open-space plan, which shall be in effect until December 31, 1973, containing, but not limited to, the following: [¶] (a) The officially adopted goals and policies which will guide the preparation and implementation of the open-space plan; and [¶] (b) A program for orderly completion and adoption of the open-space plan by December 31, 1973, including a description of the methods by which open-space resources will be inventoried and conservation measures determined.” In addition, section 65564 requires that each plan contain an
 
 action program
 
 consisting of
 
 specific programs
 
 which the legislative body intends to pursue in implementing its open space plan. Finally, the Legislature added specific provisions to the zoning law relating to open space. Section 65910 provides: “Every city and county by December 31, 1973, shall prepare and adopt an open-space zoning ordinance consistent with the local open-space plan adopted pursuant to Article 10.5 (commencing with Section 65560) of Chapter 3 of this title.”
 

 Section 65560, subdivision (a), provides that the open space plan can be adopted by the city council either as an element of the city general plan or as the local open space plan adopted pursuant to section 65563. For the open space plan to be adopted as an element of the general plan there must, of course, be a general plan.
 

 The city offers a number of ordinances that it claims fulfills the statutory requirements of a general plan. Though we find no requirement that the general plan be enacted as a single ordinance it would be preferable as the Legislature ¡intended that the local agency’s general plan and its elements and parts would “comprise an integrated, internally consistent and compatible statement of policies for the adopting agency.” (§ 65300.5.) What is required is that the city have a general plan that encompasses all of the requirements of state law. This the city’s ordinances fail to do.
 

 Section 65302 specifies the elements required to be in the plan, “The general plan shall consist of a statement of development policies and shall include a diagram.or diagrams and text setting forth objectives, principles, standards, and plan proposals. The plans shall include the following elements”: (a) a land use element; (b) a circulation element;
 

 
 *73
 
 (c) a housing element; (d) a conservation element; (e) an open space element; (f) a seismic safety element; (g) a noise element; (h) a scenic highway element; (i) a safety element. Although some of these elements were required to have been adopted as early as 1955, the latest date for adoption ((f), (g), (h), (i)) was September 20, 1974.
 

 The plan offered by the city as its general plan does not even approach the requirements of section 65302. It is, at the most, a partial plan. Of the nine elements specified in the section the city plan does not include (d), (f), (g), (h) or (i). The ordinances offered do not constitute an adequate general plan. As the city does not have a general plan it could not have adopted, pursuant to section 65560, subdivision (a), an open space plan as part of that plan.
 

 The city could, however, by following the provisions of section 65563, have adopted an open space plan. The section provides the city shall prepare and adopt a local open space plan “. . . for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction.” To accomplish this purpose the city shall adopt an interim plan to be effective until December 31, 1973, which plan shall contain a program for the orderly completion and adoption of the open space plan including a description of the methods by which the open space resources shall be inventoried and the conservation measures determined. While the city council proposed that an inventory be made of open space resources, the plan was never effectuated. The city planning officer at the trial admitted that the inventory maps to be used in conducting the inventory were never formulated. Section 65564 provides that: “Every local open-space plan shall contain an action program consisting of specific programs which the legislative body intends to pursue in implementing its open-space plan.” However, without an inventory of available open space resources there cannot be a plan as contemplated by the Open Space Lands Act—only isolated uncoordinated projects—the type of development the act was specifically intended to prevent. The act also requires that every city shall adopt an open space zoning ordinance consistent with the local open space plan (§ 65910). This was not done. The city ordinances do not constitute an open space plan.
 

 Section 65566 provides: “Any action by a county or city by which open-space land or any interest therein is acquired or disposed of or its use restricted or regulated, whether or not pursuant to this part, must be consistent with the local open-space plan.”
 

 
 *74
 
 Section 65567 provides: “No building permit may be issued, no subdivision map approved, and no open-space zoning, ordinance adopted, unless the proposed construction, subdivision or ordinance is consistent with the local open-space plan.”
 

 As the City of Morgan Hill has not adopted a valid open space plan the city cannot take any action to acquire, regúlate or restrict open space land or approve a subdivision map.
 

 The order denying a preliminary injunction and dissolving a restraining order is reversed.
 

 Rattigan, J., and Christian, J., concurred.
 

 A petition for a rehearing was denied November 9, 1977, and the opinion was nodified to read as printed above.
 

 [1]
 

 The other plaintiffs-appellants are John Biechman, council member of the City of Morgan Hill, Fred Amoroso and Gary Miller, president and treasurer of the association.
 

 [2]
 

 The defendants-respondents are Virginia Days, Mayor of Morgan Hill, council members Daniel Bertelli, Milton Pavlina, Werner Wengert, the City Council of Morgan Hill, George Lewis, Public Works Director "and City Engineer, Thomas Cheal, Fred Kahler, Arthur Lantz, Alfred Leónetti, Robert Rich, owners of real property situated on the face of El Toro, Eilert & Smith, Inc., Granite Construction Company, Rubicon Construction Company, Piazza Paving Company, and L. D. Folsom, Inc., corporations that have submitted bids for the construction work (hereinafter referred to as respondents).
 

 [3]
 

 El Toro Peak, also known as Murphy’s Peak, is a mountain 1,420 feet high situated within the City of Morgan Hill.
 

 [4]
 

 The assessment district, known as the West Dunne Avenue Assessment District, finances the construction of streets, sewer mains, water lines, drainage facilities and street lighting to service the subdivisions on the face of El Toro.
 

 [5]
 

 Save El Toro Association is an unincorporated association of residents of Morgan Hill whose sole purpose is to preserve El Toro Peak and the other open space land within the city.
 

 [6]
 

 A11 statutory citations are to the Government Code unless otherwise provided.
 

 [7]
 

 When the
 
 Great Western
 
 decision was decided in 1973, the Subdivision Map Act was found in the Business and Professions Code. When the act was transferred to the Government Code, certain substantive provisions on which El Toro relies, were added. (§§ 66473.5 and 66474.)
 

 [8]
 

 Respondents rely on
 
 Gong
 
 v.
 
 City of Fremont
 
 (1967) 250 Cal.App.2d 568 [58 Cal.Rptr. 664], and
 
 Ames
 
 v.
 
 City of Pasadena
 
 (1959) 167 Cal.App.2d 510 [334 P.2d 653], overruled on other grounds in
 
 Topanga Assn, for a Scenic Community
 
 v.
 
 County of Los Angeles
 
 (1974) 11 Cal.3d 506, 517, footnote 16 [113 Cal.Rptr. 836, 522 P.2d 12], to support its contention. In both of these cases, there was no record filed by the petitioners.