[No. D001376. Fourth Dist., Div. One. Dec. 5, 1985.]

BUENA VISTA GARDENS APARTMENTS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
CITY OF SAN DIEGO PLANNING DEPARTMENT et al.,
Defendants and Respondents;
WOODCREST DEVELOPMENT, INC., et al.,
Real Parties in Interest and Respondents.

290

292

**COUNSEL**

Richard J. Wharton and William J. Hatcher for Plaintiffs and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Senior Chief Deputy City Attorney, Eugene P. Gordon, Chief Deputy City Attorney, and Leslie J. Girard, Deputy City Attorney, for Defendants and Respondents.

James S. Milch and Milch, Wolfsheimer & Wagner for Real Parties in Interest and Respondents.

OPINION

**STANIFORTH, Acting P. J.**—Buena Vista Gardens Apartments Association and Housing Coalition of Greater San Diego (together Association) appeal the superior court's denial of a writ of mandate to set aside the San Diego City Council's (City) approval of a planned residential development permit in favor of Woodcrest Development, Inc. and Prudent Buena Vista Properties (together Developers).

The permit allows Developers to demolish 1,023 apartments in the Buena Vista Gardens Apartments complex and replace them with 2,287 condominium units over a 10-year period. Association argues City had no authority to approve the project because City's housing element fails to reasonably comply with Government Code section 65583 and because the evidence does not support the City's findings supporting issuance of the permit.

The apartments are about 30 years old and located on approximately 56 acres of land in the Clairemont Mesa community. The complex represents nearly 34 percent of the available rental housing in Clairemont Mesa. The majority of the tenants are over age 62 (74 percent), retired (76 percent) and of low or moderate income.

The Clairemont Mesa community plan provides for a density of 15 to 45 dwelling units per net acre on the property involved. The current density is about 18 dwelling units per acre. The proposed density would be about 43½ dwelling units per acre.

In February 1982, Developers applied for a planned residential development permit. The planning director approved the permit with conditions. The Association appealed the director's decision to the planning commission which denied the appeal. The permit was approved with conditions including relocation assistance for the tenants and the provision of approximately 100 units as rental units for those of the original senior citizen tenants remaining at the time the final phase is completed.

I

The legislative body of each city must adopt a "comprehensive, long-term general plan for the physical development of the city." (Gov. Code,[1] § 65300.) The general plan is intended to be an "integrated, internally consistent and compatible statement" of city policies (§ 65300.5) and

---

[1]All statutory references are to the Government Code unless otherwise specified.

is required to set forth "objectives, principles, standards and plan proposals" as to each mandatory element. (§ 65302.) A housing element is mandatory. (§ 65302, subd. (c).)

In enacting Government Code, article 10.6 (§§ 65580-65589.8), detailing requirements for the mandatory housing element, the Legislature declared the availability of housing is a matter of "vital statewide importance" and "the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order." (§ 65580, subd. (a).) To attain the state housing goal, the Legislature found, requires "cooperative participation" between government and the private sector (§ 65580, subd. (b)), cooperation among all levels of government (§ 65580, subd. (c)), and use of state and local governmental power "to facilitate the improvement and development of housing" for "all economic segments of the community" (§ 65580, subd. (d)). The Legislature recognized each local government in adopting a housing element must also consider economic, environmental and fiscal factors as well as community goals set forth in the general plan. (§ 65580, subd. (e).)

The Legislature stated its intent in enacting article 10.6 was, inter alia, "[t]o assure . . . cities recognize their responsibilities in contributing to the attainment of the state housing goal" (§ 65581, subd. (a)) and "will prepare and implement housing elements which, along with federal and state programs, will move toward attainment of the state housing goal." (§ 65581, subd. (b).)

The Legislature provided: "The housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and shall make adequate provision for the existing and projected needs of all economic segments of the community." (§ 65583.) The Legislature then set out detailed requirements for an "assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs" (§ 65583, subd. (a)), "[a] statement of the community's goals, quantified objectives, and policies relative to the maintenance, improvement, and development of housing" (§ 65583, subd. (b)), and "[a] program which sets forth a five-year schedule of actions" the city "is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element" (§ 65583, subd. (c)). The Legislature also directed cities to consider the guidelines adopted by the Department of Housing and Community Devel-

opment (§ 65585, subd. (a)) and to submit both the proposed as well as the adopted housing element to the Department for review (§ 65585, subds. (b), (c)).

Any interested party may seek review of the housing element pursuant to Code of Civil Procedure section 1085. (§ 65587, subd. (b).) Under this procedure, citizen groups may enjoin a project when the general plan either lacks a relevant element or the element is inadequate. (See *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334 [176 Cal.Rptr. 620] (inadequate housing element); *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514] (city improvement project enjoined when noise element lacking); *Save El Toro Assn.* v. *Days* (1977) 74 Cal.App.3d 64 [141 Cal.Rptr. 282] (city enjoined from acquiring, regulating or restricting open space land or approving subdivision map until valid open space plan exists). The court's function is to review the housing element to determine if the element "substantially complies" with article 10.6. (§ 65587, subd. (b).)

■ Both City and Developers maintain the substantial compliance standard for housing elements is enunciated in *Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875 [170 Cal.Rptr. 342]: "Absent a *complete failure* or at least *substantial failure* on the part of a local governmental agency to adopt a plan which approximates the Legislature's expressed desires, the courts are ill-equipped to determine whether the language used in a local plan is 'adequate' to achieve the broad general goals of the Legislature. In short, while a court, such as in *Save El Toro Assn.* v. *Days, supra,* 74 Cal.App.3d 64, may conclude that in form and general content, a local plan fails to meet the general requirements of the statute, *a court cannot and should not involve itself in a detailed analysis of whether the elements of the plan are adequate to achieve its purpose.* To do so would involve the court in the writing of the plan. That issue is one for determination by the political process and not by the judicial process." (*Id.,* at p. 884, italics added.)

*Bownds,* however, was decided before the Legislature enacted the detailed housing element requirements in article 10.6. At the time of the *Bownds* decision, the housing element requirement was contained in toto in section 65302, subdivision (c). It read: "The plan shall include the following elements:

" . . . . . . . . . . . . . . . . . . . .

"(c) A housing element, to be developed pursuant to regulations established under Section 41134 of the Health and Safety Code, consisting of standards and plans for the improvement of housing and for provision of adequate sites for housing. This element of the plan shall make adequate provision for the housing needs of all economic segments of the community."

The issues presented in *Bownds* were whether the regulations of the Department of Housing and Community Development were mandatory or advisory and whether Glendale's housing element was inadequate because it failed to address condominium conversions. The *Bownds* court concluded the regulations were "*advisory only*" (*Bownds* v. *City of Glendale, supra*, 113 Cal.App.3d 875, 885, italics added) and the housing element "represent[ed] an honest and reasonable effort to comply with the state's statutory requirements." (*Id.*, at p. 884.) The court's holding rested in large measure upon its observation: "In the absence of more specific legislation, it would ill-behoove any court to indirectly mandate such a specific 'action' program [e.g., the '"who, what and when" for the *creation* of housing'] under the guise of declaring an otherwise complete and comprehensive plan to be inadequate, basing its decision on nothing more than a subjective interpretation of such nonspecific language." (*Ibid.*)

## II

Since the *Bownds* decision, the Legislature has enacted "specific legislation" affecting the standard of review. Among other things, the Legislature has expressed its intent that "the term 'substantially complies,' . . ., be given the same interpretation as was given that term by the court in *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620]." (Stats. 1984, ch. 1009, § 44.)

The Court of Appeal in *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 95-96 [212 Cal.Rptr. 273], cited the *Camp* decision as authority, saying: "In reviewing the [general] plan before use, we have in mind that the adoption of a general plan is a legislative act; the wisdom or merits of a plan are not proper subjects of judicial scrutiny. (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 118 . . . .)

"Nonetheless, before 1982, California courts had recognized that general plans were not immune from review by courts. The courts noted the Legislature had enacted statutes that imposed mandatory duties on local agencies in connection with their adoption of general plans, and, if a local

agency violated such a statute, the courts acted to remedy the violation of state law. Thus, in *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334 . . ., the court said: 'Section 65302 enumerates the nine elements which a plan "shall include," and describes the contents of each. The word "shall" is to be construed as mandatory in this context. (Gov. Code, §§ 5, 14.) The county must accordingly "have a general plan that encompasses all of the requirements of state law." (*Save El Toro Assn.* v. *Days* (1977) 74 Cal.App.3d 64, 72 . . . .) If the plan adopted for it does not reflect substantial compliance with those requirements, the Board and other responsible agencies of the County have failed in the "performance of an act which the law specially enjoins." [¶] "Substantial compliance, as the phrase is used in the decisions, means *actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." ' (*Id.*, at p. 348 . . . .)"

Thus, the *Bownds* decision no longer accurately reflects the state of the legislatively mandated housing element nor its standard of review. The standard of review is not limited to whether there is a "complete" or "substantial" failure of a city to adopt a plan which "approximates the Legislature's expressed desires" (*Bownds* v. *City of Glendale, supra,* 113 Cal.App.3d 875, 884) but whether there is "*actual* compliance" (*Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, 348) with specified requirements. ▮ *Bownds* retains validity to the extent it prohibits a court from examining the "merits" of an element. (See *Bownds, supra,* at p. 884; *Camp, supra,* at p. 348; *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111].)

▮ Finally, the appropriate standard of appellate review is whether the local adopting agency has acted "arbitrarily, capriciously, or without evidentiary basis." (*Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 439-440 [185 Cal.Rptr. 363].) "Because the question of substantial compliance is one of law, this court need not give deference to the conclusion of the trial court. (*Twain Harte Homeowners Assn.* v. *County of Tuolumne, supra,* 138 Cal.App.3d at p. 674 [188 Cal.Rptr. 233].)" (*Concerned Citizens of Calaveras County* v. *Board of Supervisors, supra,* 166 Cal.App.3d 90, 96.)

### III

Association contends City's housing element is defective in these specifics: There is a failure to set forth a five-year schedule of actions (§ 65583, subd. (c)), a failure to identify adequate sites to meet City's housing goals (§ 65583, subd. (c)(1)); a lack of a program to assist in the development of

adequate housing for low- and moderate-income households (§ 65583, subd. (c)(2)); a lack of a program to conserve and improve the condition of the existing affordable housing stock (§ 65583, subd. (c)(4)); a failure to adequately identify the officials and agencies responsible for implementing City's programs (§ 65583, subd. (c)); a failure to describe the public participation involved in developing the housing element (§ 65583, subd. (c)); and a lack of quantified objectives in City's housing action program (§ 65583).[2]

These claimed defects largely reflect the June 1982 analysis of City's housing element by the Department of Housing and Community Development (Department). The Department found: "The adopted element contains a comprehensive and in-depth analysis of housing problems generally, and San Diego's problems specifically. With several minor exceptions, the City's housing needs, resources, and constraints are well documented. . . . However, despite all of these very positive efforts, *the San Diego housing element adopted September 29, 1981 does not yet meet all of the requirements of Article 10.6 of the Government Code.*" (Italics added.)

## IV

We address Association's contentions of deficiency seriatim.

First, the code specifies: "The element shall contain . . . [a] program which sets forth a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element . . . ." (§ 65583, subd. (c).)

The housing action program itself notes it is "an incomplete listing of implementation measures" and lists its program time spans as "FY 1981-1982;" "FY 1982-1983" or as "continuing." The Department found this did "not clearly encompass a five year time span as required by law."

---

[2]The defects alleged by Association differ somewhat depending on whether one looks to their petition for writ of mandate, their opening brief on appeal or their closing brief. City responds only to the defects as phrased in the petition and asks us not to address those defects which are raised for the "first time" on appeal. (See *Sierra Club, Inc.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 495, 503 [157 Cal.Rptr. 190].) We note, however, Association's contentions on appeal are not truly new, but rather variations on those contentions raised below and contained in the Department of Housing and Community Development report appended to their petition. Moreover, contentions which are strictly matters of law and do not rest upon a resolution of conflicting facts may be raised for the first time on appeal. (See *Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].)

City argues, in light of the legislatively mandated five-year time span "continuing" must be construed as "continuing over five years." This interpretation seems reasonable. While a more definitive time table is preferable for City action programs, the City is in substantial compliance with this requirement. To invalidate the housing element on this ground would be to elevate form over substance.

V

 The code requires: "The program shall . . . [i]dentify adequate sites which will be made available through appropriate zoning and development standards and with public services and facilities needed to facilitate and encourage the development of a variety of types of housing for all income levels, including rental housing, factory-built housing and mobilehomes, in order to meet the community's housing goals as identified in subdivision (b). The program may include an identification of adequate sites for emergency housing." (§ 65583, subd. (c)(1).)

The Department noted this requirement "envisions two responses: (1) provision of a sufficient supply of land that is zoned for residential use and served by infrastructure that is or will be made available to meet the locality's identified new construction needs in the aggregate; and (2) provision of a sufficient variety of sites in terms of cost and density to meet the needs of households at various income levels."

The Department pointed out the zoning ordinance provided some variety of housing type, but City needed to document sites were being made available for assisted housing, manufactured housing and mobilehomes. The only "program" in City's housing element which addresses this matter is contained in section 5.4 and states: "City-owned land designated for residential use and surplus to public facility needs may be offered to public and non-profit housing agencies for development of affordable housing. This will continue the program which has committed about 226 acres of City-owned land valued in excess of $22.9 million to production of over 1,700 affordable units. (Continuing. City Council.)"

Department asserted this program only stated City "*may*" offer land and "does not evidence a firm commitment to implementation." Department also noted "there is no indication of how much land will be made available, its zoning, or dwelling-unit capacity." However, elsewhere in City's housing element, City states San Diego is divided into 40 subareas each with its own community plan and City has set forth the capacity of each subarea community plan and the capacity remaining for further residential devel-

opment. The capacity remaining exceeds City's housing needs for the five-year time span contemplated by the element.

Moreover, in section 2.5.2 of the element, City addresses "Available Housing Sites" and states it has developed a computer program to monitor development projects throughout the development process and therefore can obtain "a picture of current patterns and a one- to three-year look into the future." This section thus, is evidence of compliance with section 65583, subdivision (c)(1)'s requirement that City identify adequate sites.

While nowhere in the housing element itself is found a provision of specific sites for mobilehomes, rental housing or factory-built housing, it appears these designations may be in the detailed community plans which are referred to in City's housing element. Association has not shown these community plans fail to make adequate identification of appropriate sites. On this state of the record we find City's housing element is in substantial compliance with section 65583, subdivision (c)(1).

## VI

The statute provides the program shall "[a]ssist in the development of adequate housing to meet the needs of low- and moderate-income households." (§ 65583, subd. (c)(2).)

City's Housing Action Program, section 5.4, "Affordable Housing Development," provides:

"5.4 Affordable Housing Development

"o Studies will be undertaken to determine the feasibility of consolidating responsibility for public housing program review and approval in a single decision-making body in order to simplify and expedite development of assisted projects. This consolidation will not include those discretionary actions vested in design review boards, etc. (FY 1981-82. City Council.)

"o Referendums to provide authority under Article XXXIV of the California Constitution for the development, acquisition, financing and/or ownership of at least 2,500 housing units will be placed before the voters. (FY 1981-82. City Council.)

"o City-owned land designated for residential use and surplus to public facility needs may be offered to public and non-profit housing agencies for development of affordable housing. This will continue the program which

has committed about 226 acres of City-owned land valued in excess of $22.9 million to production of over 1,700 affordable units. (Continuing. City Council.)

"o Density bonuses of up to 50 percent will be permitted for projects which provide at least 20 percent housing affordable by low- and/or moderate-income households pursuant to the City's Affordable Housing Density Bonus Program. Additional density variances will be considered for projects meeting other criteria such as very low-income affordable housing. (Continuing. City Manager, Planning Commission and Department, Housing Commission.)

"o An annual Housing Assistance Plan shall be prepared detailing each agency's programs and goals for providing new affordable housing, assisting rehabilitation and preserving existing affordable housing. (Continuing. Housing Commission and all Development Corporations.)"

The Department criticizes City's action program for failing to give more complete descriptions of its programs and not setting forth "a comprehensive five-year schedule of actions." The Department also suggested how City might improve its density bonus program.

While it may be true City could improve this aspect by including more detail and by adopting other programs, we conclude its "Affordable Housing Development" program is in substantial compliance with section 65583, subdivision (c)(2). That section requires only that City "*assist*" in the development of housing to meet the needs of low-and moderate-income households. All of the programs in the "Affordable Housing Development" program are directed toward assisting this development. The fact City might be able to adopt other and, perhaps, more effective programs would be to review the merits of the program. This is not the appellate court function. We find City is in substantial compliance with section 65583, subdivision (c)(2).

## VII

■ The statute provides: "The program shall . . . [c]onserve and improve the condition of the existing affordable housing stock." (§ 65583, subd. (c)(4).)

The Department contends this requirement "anticipates two types of program responses: 1) conservation and rehabilitation of the structural condi-

tion of the existing housing stock, and 2) conservation of the existing affordable housing opportunities in the community."

City says it has complied with this requirement in section 5.5 (housing quality conservation) of its housing action program. This section provides:

"o The Municipal Code will be amended to include state approved rehabilitation codes as alternatives to other uniform codes. (FY 1981-82. City Council.)

"o Housing Code inspections will be focused upon concentrated rehabilitation and neighborhood improvement areas. (Continuing. City Manager.)

"o The Community Development Black [*sic*] Grant and other assistance programs shall be programmed to focus public facility improvements upon concentrated rehabilitation and neighborhood improvement areas. (Continuing. City Council, City Manager.)

"o Community-based, self-help rehabilitation training services will be initiated and assisted in neighborhood improvement and concentrated rehabilitation areas. (Continuing. Housing Commission and all Development Corporations.)"

These programs all address the conservation and rehabilitation of the structural condition of the existing housing stock and not the conservation of existing affordable housing opportunities in the community. In particular, as pointed out by the Department, there are no programs directed to how the city will "encourage" conservation of mobilehome parks or will conserve the existing affordable apartment rental stock. The Department viewed this latter omission "as a serious deficiency in the element given the City's declining multiple-family vacancy rate and threatened loss of approximately 11% of the City's total apartment inventory." (*Ibid.*)

Underlying the City's approval of Developers' planned residential permit was the fear if City did not approve the permit, *Developers would raze the apartment complex anyway* since City lacked discretion to deny Developers a demolition permit. This factor demonstrates City's lack of a program to conserve its stock of affordable housing, particularly its affordable rental stock.[3]

---

[3]The Legislature has expressed specific concern with the demolition of low- and moderate-income housing in the coastal zone. (See §§ 65590, 65590.1.)

We conclude City has not substantially complied with section 65583, sub-division (c)(4).

## VIII

■ The statute requires: "The program shall include an identification of the agencies and officials responsible for the implementation of the various actions . . . ." (§ 65583, subd. (c).)

The Department noted "the housing element does not clearly delineate the roles and responsibilities of the various entities responsible for implementation of the City's housing programs" and, in particular, criticized City's failure to define the term "all Development Corporations." The Legislature, however, did not require a detailed description of the roles and responsibilities but only "an identification of the agencies and officials responsible for the implementation." We find City substantially complied with this requirement, since it listed generally the entity or official responsible for implementation (e.g., "City Council," "City Manager," "Planning Commission & Department").

## IX

■ The statute declares: "The local government shall make a diligent effort to achieve public participation of all economic segments of the community in the development of the housing element, and the program shall describe this effort." (§ 65583, subd. (c).)

City's housing element fails to include any description of City's effort to include public participation. However, it is clear there was ample public participation in the development of the housing element. (See declaration of Tim O'Connell; Department of Housing and Community Development Report noting the Housing Coalition of Greater San Diego among others had a standing request for copies of housing element reviews.) The Legislature's concern was with actual public participation rather than a description of that public participation. We conclude the omission to be a "technical imperfection" which does not justify enjoining approval of a planned residential development permit.

## X

■ Throughout its report, Department is critical of City's failure to make quantifications in its programs, e.g., City's failure to state how much land would be available in its program for assisted housing. City's failure

to quantify objectives for rehabilitation or conservation Department stated: "The complete absence of quantification in the program section of the adopted housing element makes it impossible to determine exactly what the City intends to accomplish."

City contends section 65583, subdivision (c), does not require any quantification in its programs and that, moreover, this is an attack on the merits, an evaluation of the plan's ability to perform.

Section 65583 states "The housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, *quantified objectives* and scheduled programs for the preservation, improvement, and development of housing." (Italics added.) Subdivision (b) requires "[a] statement of the community's goals, *quantified objectives,* and policies relative to the maintenance, improvement, and development of housing." (Italics added.) Subdivision (c)(1) requires a program to "[i]dentify adequate sites . . . in order to meet the community's housing goals as identified in subdivision (b)." Subdivision (b) explains: "It is recognized that the total housing needs identified pursuant to subdivision (a) may exceed available resources and the community's ability to satisfy this need within the content of the general plan requirements outlined in Article 5 (commencing with Section 65300). Under these circumstances, the quantified objectives need not be identical to the identified housing needs, but should establish the maximum number of housing units that can be constructed, rehabilitated, and conserved over a five-year time frame."

These sections make clear the Legislature's intent that cities quantify their housing objectives in their housing elements. City has failed to meet this requirement unless the projected housing needs are equated with the housing objective. This is not an unreasonable construction in light of the fact City's capacity exceeds its needs.

The program requirements of section 65583, subdivision (c), do not expressly require quantification except to the extent subdivision (c)(1), requires identification of adequate sites. Otherwise, the Legislature has spoken in terms of cities developing programs to "*[a]ssist* in the development of adequate housing" (subd. (c)(2)), "*[a]ddress*" governmental constraints (subd. (c)(3)), "*[c]onserve* and *improve*" the condition of affordable housing (subd. (c)(4)), and "*[p]romote* housing opportunities" (subd. (c)(5)). (Italics added.) These terms do not necessarily mandate a precise quantification in programs. While Department is correct in concluding the lack of quantification makes it difficult to assess the programs, we do not think the lack of quantification invalidates City's housing element.

The Department's review of City's housing element differs from our judicial review. The Department reviews not only to ensure the requirements of 65583 are met, but also to make suggestions for improvements. In that context, the lack of quantification makes Department's job more difficult. However, a court looks only to ensure the requirements of 65583 are met and not whether, in the court's judgment, the programs adopted are adequate to meet their objectives or are the programs which the court thinks ought to be there. While this court may be of the opinion City should adopt Department's recommendations, *the Legislature has stated its recommendations are advisory.* (§ 65585, subd. (a).)

## XI

City inappropriately contends section 65583, subdivision (c), is not applicable to the City of San Diego because it intrudes into matters traditionally reserved to municipalities.

The California Constitution provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (Art. XI, § 5.)

In charter cities, such as San Diego, the city charter, ordinances and regulations which relate to purely municipal affairs prevail over state laws on the same subject. (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].) However, if a matter is of statewide concern, then charter cities must yield to the applicable general state laws regardless of the provisions of its charter. (*Ibid.*) Whether a matter is of municipal or statewide concern is for judicial determination. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137].) Nonetheless, the judiciary will accord great weight to the Legislature's evaluation of whether a matter is of statewide concern. (*Baggett* v. *Gates, supra,* 32 Cal.3d 128, 136; *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63.)

The Legislature has expressly declared housing to be a matter of statewide concern not only in article 10.6 of the Government Code (§ 65580) but also in a number of other provisions (see, e.g., Health & Saf. Code, §§ 33250, 50001-50004; Stats. 1984, ch. 1691, § 1 et seq.; Stats. 1982, ch. 1440, § 1, subd. (a); Stats. 1981, ch. 974, § 1; Stats. 1981, ch. 887, § 1; Stats. 1979, ch. 1043, §§ 1, 2.) The judiciary has likewise found the need to provide adequate housing to be a matter of statewide concern. (See *Marina Point,*

*Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 743 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 625 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Bruce* v. *City of Alameda* (1985) 166 Cal.App.3d 18, 21-22 [212 Cal.Rptr. 304].) As the court noted in *Bruce* v. *City of Alameda, supra,* 166 Cal.App.3d 18, 22: "These high pronouncements [of statewide need for adequate housing] do no more than iterate what is the common knowledge of all. (See Evid. Code, § 452, subd. (h).)"

City concedes "there is a legitimate statewide concern in requiring all cities and counties to adopt general plans, the meat and substance of which is statements of policy," but argues section 65583, subdivision (c), impermissibly intrudes into municipal affairs by requiring a local government to "use its' [*sic*] legislative and administrative authority to actually accomplish specific goals." This argument would limit the Legislature to declarations matters were of statewide concern and would prohibit the Legislature from compelling cities to take action to address the concern. Such argument has no merit. Moreover, section 65583, subdivision (c), leaves cities considerable discretion in the manner of implementing programs to reach the state housing goal. Finally, in section 65589 the Legislature has expressly recognized cities' right to govern their municipal affairs and has provided:

"(a) Nothing in this article shall require a city, county, or city and county to do any of the following:

"(1) Expend local revenues for the construction of housing, housing subsidies, or land acquisition.

"(2) Disapprove any residential development which is consistent with the general plan.

"(b) Nothing in this article shall be construed to be a grant of authority or a repeal of any authority which may exist of a local government to impose rent controls or restrictions on the sale of real property.

"(c) Nothing in this article shall be construed to be a grant of authority or a repeal of any authority which may exist of a local government with respect to measures that may be undertaken or required by a local government to be undertaken to implement the housing element of the local general plan.

"(d) The provisions of this article shall be construed consistent with, and in promotion of, the statewide goal of a sufficient supply of decent housing to meet the needs of all Californians."

## XII

These further miscellaneous contentions of error are made. ■ Developers contend the appellants are precluded from attacking the housing element because of the doctrine of laches. Developers point out the Housing Coalition had a standing request to receive a copy of all of City's housing element reviews, failed to bring any legal attack on the sufficiency of the housing element until the instant action, and that Developers expended over a million dollars on architectural, engineering, legal and other services in connection with its application.

Developers rely upon *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257, 265 [113 Cal.Rptr. 328], and *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 235-236 [69 Cal.Rptr. 251]. Both of these cases applied the doctrine of laches because the plaintiffs had failed to make any challenges based on ordinances during the review of the developer's application. Indeed, in *Millbrae,* plaintiffs failed to bring a challenge until after the developer had already completed part of his project. That is not the situation involved here. Appellants have challenged approval of the project at every stage. The doctrine of laches does not apply to the case at bar. It is particularly inapplicable to Association since there is no indication that it was involved in the development or review of City's housing element.

■ Developers next contend Association failed to join indispensible parties, that is, others who have received permits invalid due to the inadequacy of the housing element.

This issue was disposed of in *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, 354, where the court concluded all indispensible parties had been joined because the petitions involved there, as in the instant case, did not seek to cancel or suspend any approval previously granted.

■ Finally, Association contends the administrative record does not support City's findings:

The City found:

"1. The proposed use will fulfill an individual and/or community need and will not adversely affect the General Plan or the community plan. The plan encourages a wide range of residential densities and building types. The proposed project includes townhouses, mid-rise and high-rise buildings. The proposed density of the project is 40 dwelling units per acre which is

within the range of 15 to 45 units shown in the community plan. The Planning Director believes that this finding can be made.

"2. The proposed use, because of conditions that have been applied to it, will not be detrimental to the health, safety, and general welfare of persons residing or working in the area and will not adversely affect other property in the vicinity. The proposed project includes pedestrian access to be continued along Cowley Way. In addition, the proposed project includes observation areas to be located on the north and south of the area to ensure continued public access and visibility to the adjacent Tecolote Canyon. A landscaping plan is proposed which will enhance the Tecolote Canyon area where disturbed for the purposes of drainage plan. The Engineering and Development Department has indicated that there is adequate access for vehicular traffic and emergency vehicles. The parking ratio shown on Exhibit 'A' is considered adequate by the Engineering and Development Department.

"3. The proposed use will comply with the relevant regulations in the Municipal Code. The Planning Director believes that this finding can be made. The PRD Ordinance requires in the R-3 Zone, 26 acres of total open space. The PRD is proposing 42 acres which is 16 acres in excess of the minimum required. The proposed usable open space required is 13.1. The permit indicates 27.8 which is 14.7 acres in excess of what is required. In addition, the application proposes a variety of recreational facilities."

Association also argues City's finding the project was not detrimental to the public health, safety and general welfare was factually unsupported. It is argued the City acted contrary to the health, safety and welfare of the apartment residents and therefore abused its discretion.

We note the health, safety and general welfare standard applies to the community generally rather than to just the apartment tenants. There was substantial evidence to support City's finding the Villamar project would not be detrimental to the health, safety or general welfare of the community. City heard testimony on the impact of the project on the community and specifically adopted mitigating factors, inter alia, to ensure emergency vehicle access, canyon access and to lessen the impact of the project on the canyon (planting and drainage requirements, placement of the canyon rim units).

Additionally, City considered the impact of the project on the apartment tenants and considered, inter alia, the fact the project would be phased in over 10 years, the past vacancy rate in the complex, the income levels of

the tenants, the availability of rental housing generally, and alternatives to project approval including renovation, subsidization and Developers' planned demolition if the permit was denied. In light of the project's impact on the senior tenants of the complex, City required Developers to provide relocation assistance and up to 100 rental units for those of the original tenants remaining at the time the project was completed. Under these circumstances, we cannot say City findings in these areas are unsupported by the evidence except as this court has found (in VII above) a failure to substantially comply with section 65583, subdivision (c)(4).

We have found City's housing element was incomplete on one relevant aspect, i.e., a program to conserve existing housing stock.

"Does the lack of a mandatory element in a general plan invalidate the entire plan? Yes, if the missing element was directly involved in the projects being reviewed. (*Save El Toro Assn.* v. *Days* (1977) 74 Cal.App.3d 64 . . .; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 . . . .) Absence of relevant elements in a general plan precludes enactment of zoning ordinances and the like. (*Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806 . . . .) If a plan does not reflect substantial compliance with the mandatory elements the responsible agency has failed to perform an act which the law specially enjoins. (*Camp* v. *Board of Supervisors,* 123 Cal.App.3d 334, 348 . . . .)" (*Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 592-593 [197 Cal.Rptr. 303].)

Here, however, we have found substantial compliance as to each of the required elements except one. An unqualified granting of a writ is not warranted in these circumstances.

The writ is granted with direction to the trial court to refuse approval of the permit until the defects in the plan as specified in this opinion are corrected to substantially conform to the statutory requirement. In all other respects the decision of the trial court is affirmed.

Wiener, J., and Work, J., concurred.